AO106(Rev.5/85) Affidavit for Search Warrant

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

In the Matter of the Search of
(Name, address or brief description of person, property, or premises to be searched)

1112 Eastern Avenue, NE
Apartment #104
Washington, DC

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

CASE NUMBER:

(Further described below)

I _____William T. Smith_____ being duly sworn depose and say:

I am a(n) _____Special Agent, Alcohol, Tobacco & Firearms (ATF)_____ and have reason to believe
(Official Title)

that ☐ on the person of or ☒ on the property or premises known as (name, description and or location):
1112 Eastern Avenue, NE, Apt. #104, Washington, DC, is described as a 3 level red brick residential apartment building. Attached to the front of the building is a Blue awning with 2 white stripes and the numbers 1112 are displayed on both the awning itself and on the outside front of the building located to the left of the front entrance door. Apartment 104 is located on the 1st floor and the door is dark red in color w/a gold door knocker affixed displaying the numbers 104.

in the District of Columbia, there is now concealed a certain person or property, namely (describe the person or property to be searched)
**See attached Affidavit**

which is (state one or more bases for search and seizure set forth under Rule 41(c) of the Federal Rules of Criminal Procedure)
**See attached Affidavit**

concerning a violation of Title _21_ United States Code, Section(s) _841(a)_. The facts to support a finding of Probable Cause are as follows:

SEE ATTACHED AFFIDAVIT HEREIN INCORPORATED BY REFERENCE AS IF FULLY RESTATED HEREIN

Continued on the attached sheet and made a part hereof.     ☒ YES    ☐ NO

Nancy B. Jackson
Assistant United States Attorney
(202) 307-0029

Signature of Affiant
William T. Smith, Special Agent
Alcohol, Tobacco & Firearms

Sworn to before me, and subscribed in my presence

_____
Date

at Washington, DC

_____
Name and Title of Judicial Officer

_____
Signature of Judicial Officer

BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES
Washington, D.C.

**Affidavit in Support of an Application for Search Warrant for:**

<u>XXXX EASTERN AVENUE #XXX NORTHEAST
WASHINGTON, D.C.</u>

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

_____

**I. BACKGROUND AND EXPERIENCE**

1. Your affiant, Special Agent William T. Smith, of the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF"), upon being duly sworn, hereby declare under the penalty of perjury and say the following is true based upon personal knowledge and information from other law enforcement officers:

2. Your Affiant is currently assigned to the Washington, D.C. area High Intensity Drug Trafficking Area ("HIDTA") Task Force and has been assigned to the HIDTA Task Force since September of 2007. Prior to this, your affiant was assigned to the ATF Washington D.C. Violent Crime Impact Team and HIDTA Task Force in Annandale, Virginia. Prior to becoming an ATF Special Agent, you affiant was a United States Border Patrol Agent for over five years in San Diego, California.

3. Since becoming a Special Agent with the ATF, your affiant has taken part in numerous narcotics and firearms related investigations involving armed drug traffickers, armed gangs, felons in possession of firearms and ammunition, firearms trafficking, and the use of firearms in furtherance of illegal drug trafficking. In addition, your affiant has attended training related to narcotics and firearms investigations at the Federal Law Enforcement Training Center

in Glynco, Georgia and has received additional criminal investigation training, particularly related to illegal drug trafficking, from HIDTA.

4. Your Affiant has participated in the execution of over one hundred search warrants in the Washington, D.C. metropolitan area, which have resulted in the recovery of firearms and ammunition, illegal drugs and drug packaging material, and other drug paraphernalia, including, but not limited to, electronic digital scales, cooking equipment, various chemical additives associated with illegal drug production, and items for drug usage.

5. In addition, these warrants have also led to the recovery of items such as shell casings, magazines, holsters, gun cases and safes, photographs of individuals with narcotics and firearms, large amounts of United States currency, records and documents associated with drug trafficking, and documentary evidence indicative of ownership and/or control of property.

6. During the course of your affiant's training and professional experience in the area of law enforcement, I have become familiar with narcotics and illegal drug-related crime in the Washington, D.C. metropolitan area and with the methods used to manufacture, package and distribute controlled substances. This knowledge has in part been the result of being present during dozens of interviews of defendants, witnesses, confidential informants, police officers and other law enforcement officers. In addition to my participation in numerous search warrants as described above, I have also participated in the arrest of dozens of individuals in the Washington, D.C. metropolitan area for narcotics-related offenses. Based on this training and experience, I have learned that:

> A) It is common for narcotic traffickers to secrete narcotics in secure locations within their residences, vehicles, businesses and other locations over which

they maintain dominion and control, for ready access, and to conceal these items from law enforcement authorities. In addition, items and paraphernalia used to process or package illegal narcotics are often stored along with such secreted narcotics.

B) It is common for individuals who sell narcotics to maintain in their residence large amounts of U.S. currency in order to maintain and finance their ongoing narcotic business. Other proceeds of illegal narcotics sales, such as jewelry and other valuables, may be stored in the residence along with currency. Additionally, your affiant knows that these same individuals keep receipts, bank statements, money drafts, letters of credit, money orders and cashier checks, bank checks, currency counting machines and other items related to the obtaining, secreting, transfer, or concealment of assets in the form of U.S. currency and other financial instruments.

C) It is common for records of narcotic transactions and papers relating to the accumulation and disposition of assets (such as, but not limited to, books, ledgers, bank books and statements, and notes or logs) derived from narcotic trafficking to be stored by narcotic distributors in their residences and vehicles. In addition, it is common for papers and documents related to the ownership, occupancy and control of the premises and vehicles to be stored within the premises and vehicles.

D) It is common for people who sell illegal drugs to maintain addresses, telephone books, electronic paging devices, cellular telephones and other items reflecting names, addresses, and telephone numbers of associates and co-conspirators. These items are frequently kept at the same location as the controlled substances. In addition, drug traffickers have photographs or video tapes of themselves and their associates in the drug trade, as well as property derived from the distribution of narcotics, and such items are often kept in their residence.

E) Participants in drug trafficking and other violent criminal activity often possess and maintain weapons and ammunition. Weapons are often stored in the subject's residences or vehicles for their protection and for the protection of their illegal narcotics and the assets generated from the sales of the illegal narcotics. Firearms are generally kept in secure locations to protect them from theft and discovery by law enforcement authorities, thus reducing exposure to criminal liability. In your affiant's experience, the recovery of weapons during the execution of search warrants is usually accompanied by the recovery of additional ammunition, magazines, bulletproof vests and documentary evidence indicative of ownership and possession of firearms.

7. Since this affidavit is being submitted for the limited purpose of supporting probable cause, the affiant has not included every fact known to him or conveyed to him concerning this investigation. He has set forth only those facts that he believes are sufficient to support a probable cause finding for the issuance of the requested search warrant.

## II. LOCATION TO BE SEARCHED

Affidavit in support of a search warrant for the entire premises known as XXXX Eastern Avenue, Northeast, Apartment #XXX, Washington, D.C.

## III. DESCRIPTION OF PREMISES

Affidavit in support of a search warrant for the entire premises known as XXXX Eastern Avenue, Northeast, Apartment #XXX, Washington, D.C. The building known as XXXX Eastern Avenue Northeast, Washington, D.C., is described as a three-level red brick residential apartment building. On the front of the building is a blue awning with two white stripes. The numbers "XXXX" are displayed on both the awning itself and on the outside of the building to the direct left of the front entrance door. The apartment known as "XXX" is on the first floor of the building. The apartment door is dark red in color. A gold in color door knocker containing the numbers "XXX" is affixed to the apartment door.

## III. THE INVESTIGATION

8. In October of 2007, the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") and the Metropolitan Police Department ("MPD") began investigating illegal fencing operations specializing in the trade of stolen property for illicit narcotics and firearms. The investigation utilized a confidential informant (hereinafter referred to as "CS-1"). CS-1 began cooperating with the ATF in or about October of 2007. CS-1 also has an extensive criminal history and is

working with the government pursuant to a cooperation agreement. CS-1 has not been paid for the assistance it has provided in connection with this investigation and CS-1 is presently incarcerated. CS-1's information has been corroborated by other sources of information, evidence gathered during this investigation, and other investigations conducted by the ATF. CS-1 has never been known to provide false information.

    9. CS-1 was debriefed and provided detailed information regarding several fencing operations about which it had knowledge, including the identity of individuals involved in narco-fencing, that is, trading illegal narcotics for stolen property. One individual identified was RONALD HALEY.

    10. On October 11, 2007, CS-1 placed a monitored and recorded phone call to RONALD HALEY to facilitate the trade of bait property[1] and United States currency in exchange for crack cocaine. During the phone call, RONALD HALEY instructed CS-1 to meet him in the vicinity of 13th and W Street Northwest, Washington, D.C. Prior to meeting RONALD HALEY, CS-1 was searched and found to be free of any illegal contraband or monies. CS-1 and an ATF undercover agent then waited for RONALD HALEY at the intersection of 13th and W Street Northwest, Washington, D.C.

    11. While waiting, CS-1 observed RONALD HALEY enter the block and appear to engage in the sale of illegal narcotics to an individual in the block. RONALD HALEY then approached CS-1 and advised CS-1 that he did not have all of the crack cocaine needed to

---

[1] Bait property is property law enforcement uses in the investigation of narco-fencing operations. Targets of the investigation, believing the bait property to be stolen, trade illegal narcotics for the bait property.

complete the transaction. RONALD HALEY explained to CS-1 that his brother, JOHN HALEY, would be interested in the bait property and would contact CS-1 to arrange a deal.

12. Subsequently, RONALD HALEY advised CS-1 that RONALD HALEY had negotiated a deal with his brother, JOHN HALEY, to sell one ounce of crack cocaine for the bait property. As a result, the undercover agent and CS-1 drove to the intersection of 9th and V Street Northwest, Washington, D.C. and met with RONALD HALEY. RONALD HALEY entered the undercover vehicle and directed the undercover agent to JOHN HALEY'S residence located at XXXX Eastern Avenue Northeast, Apartment #XXX, Washington, D.C.

13. Upon arrival, RONALD HALEY and CS-1 carried the bait property into apartment XXX while the undercover agent waited in the vehicle. Once inside, CS-1 traded, with JOHN HALEY, the bait property and $400.00 in pre-recorded ATF funds for approximately 29 grams of crack cocaine. CS-1 then engaged both JOHN HALEY and RONALD HALEY in conversation regarding future transactions. CS-1 explained to both JOHN HALEY and RONALD HALEY that the undercover agent worked at a Target warehouse and could steal additional items of merchandise. As a result of the conversation, JOHN HALEY requested additional items of merchandise for his residence, apartment XXX.

14. Following the transaction, RONALD HALEY and CS-1 left the apartment and returned to the vehicle where the undercover agent had remained. The undercover agent gave CS-1 a Target gift card that was credited with $100. CS-1 then gave RONALD HALEY the gift card and RONALD HALEY returned to apartment XXX and gave JOHN HALEY the gift card. CS-1 then gave the undercover agent the crack cocaine it purchased from JOHN HALEY.

15. The undercover agent placed the suspected crack cocaine on a digital scale and determined the weight to be approximately 29 grams, and a portion of the suspected crack cocaine tested positive for the presence of cocaine. RONALD HALEY eventually returned to the undercover agent's vehicle and was driven back to the intersection of 9th and V Street Northwest, Washington, D.C. While enroute, the undercover agent and CS-1, in the presence of RONALD HALEY, discussed the profit range that could be obtained from the re-sell of the crack cocaine in Virginia. RONALD HALEY joined in the conversation and stated, "Once they get a taste of the quality, they will be coming back for more".

16. On October 17, 2007, the undercover agent and CS-1 again met with RONALD HALEY at the intersection of 9th and V Street Northwest, Washington, D.C. in order to complete the deal arranged with JOHN HALEY during the first transaction. The undercover agent drove to the rear of JOHN HALEY'S apartment building, RONALD HALEY and CS-1 exited the vehicle, and carried the bait property JOHN HALEY had requested into apartment XXX, JOHN HALEY'S residence.

17. Once inside the residence, JOHN HALEY asked CS-1 to connect the television. CS-1 was unable to do so and as a result, JOHN HALEY approached the undercover agent, who was waiting inside the vehicle, and asked the undercover agent to come inside apartment XXX to connect the television.

18. The undercover agent entered JOHN HALEY'S residence to connect the television. While inside, JOHN HALEY entered his bedroom and returned with a large freezer bag that contained large chucks of a white rock-like substance believed to be crack cocaine. JOHN HALEY removed approximately 88 grams of the suspected crack cocaine from the freezer bag

and gave it to CS-1 as payment for the bait property. CS-1 then gave JOHN HALEY an additional $2,000 in ATF pre-recorded funds. JOHN HALEY gave RONALD HALEY approximately 3.5 grams of suspected crack cocaine for brokering the transaction.

19. Upon completion of the transaction, the undercover agent, CS-1 and RONALD HALEY returned to the vehicle and drove to RONALD HALEY'S drop-off point. While enroute, the undercover agent purchased the approximately 3.5 grams of suspected crack cocaine from RONALD HALEY with $128.00 dollars in pre-recorded ATF funds. A portion of the 88 grams of suspected crack cocaine was field tested and yielded a positive reaction for the presence of cocaine. A portion of the 3.5 grams of suspected crack cocaine was field tested and yielded a positive reaction for the presence of cocaine.

20. On January 16, 2008, the undercover agent drove to JOHN HALEY'S residence after arranging a deal to trade bait property for two ounces of crack cocaine. Upon arrival, the undercover agent observed JOHN HALEY, RONALD HALEY and a subject identified as KENNETH POSEY standing in the hallway of the building. The undercover agent entered the building and was introduced to POSEY by JOHN HALEY and RONALD HALEY. POSEY indicated that he would be conducting the transaction and asked the undercover agent the price of the bait property. POSEY gave the undercover agent approximately 43.5 grams of suspected crack cocaine and $300.00 in United States currency for the bait property.

21. The undercover agent the left the building with JOHN HALEY and proceeded to the undercover vehicle were the bait property was stored. The undercover agent and JOHN HALEY then carried the bait property inside JOHN HALEY'S residence. The undercover agent exited the building, entered the vehicle and left the area. A surveillance team remained outside JOHN

HALEY'S residence. Within an hour of the transaction, the surveillance team observed two individuals fitting the descriptions of KENNETH POSEY and RONALD HALEY exit the building with the bait property and load the property into a white, Chevy, van with Washington, D.C., tags XXXXXX and proceeded to POSEY'S residence. POSEY was observed carrying the television into his residence.

22. On January 22, 2008, POSEY contacted the undercover agent and requested certain bait property in exchange for illegal narcotics. On January 24, 2008, POSEY inquired of the undercover agent whether the bait property requested would fit into his car which he identified as a Buick Century. Thereafter POSEY met the undercover agent at the Washington D.C., Farmers Market. POSEY was driving a 1998 maroon Buick Century bearing Maryland tags. During the transaction, POSEY helped the undercover load the bait property into the Buick Century. POSEY then got into the undercover vehicle and handed the undercover a plastic baggie filled with powder cocaine. POSEY informed the undercover that he had 60 grams of powder and 30 grams of crack cocaine, however, the crack was for another friend. POSEY also informed the undercover that a girl he knows cooks the cocaine into crack for him and that he was in the process of trying to obtain 1/2 kilo of cocaine.

23. Following the deal, the undercover handed to POSEY a list of products that the undercover could get and trade for illegal narcotics. The list included cigarettes. POSEY inquired about the cost of cigarett, and the undercover told POSEY that he would sell Newport brand cigarettes for $1100 per master-case. POSEY stated that he would pay $1000.00 per case or trade an ounce of cocaine per case. The undercover agreed and told POSEY he would call POSEY when the Newport cigarettes were available. POSEY stated that he would sell them on

the corner to throw the cops off by making the cops think he was only selling cigarettes and not illegal narcotics.

24. Shortly thereafter, POSEY was observed arriving at his residence and carrying in to his residence three boxes fitting the description of the bait property he had purchased from the undercover. Other bait property was observed sitting in Posey's vehicle. The undercover agent weighed the cocaine Posey exchanged for the bait property and it weighted approximately 29.1 grams and field tested positive for the presence of cocaine.

25. On June 3, 2008, at approximately 3:45 p.m., the undercover agent met with RONALD HALEY at 9th and V Street Northwest, Washington, DC. RONALD HALEY and the undercover then drove to XXXX Eastern Avenue, N.E., apartment XXX, Washington, DC, where they met JOHN HALEY and KENNETH POSEY. While there the undercover exchanged a master-case of Newport brand cigarettes for $900 in United States currency.

Based on the foregoing your affiant submits that secreted within the confines of XXXX Eastern Avenue, Apartment XXX, Northeast, Washington, D.C., is evidence and instrumentalities of the crimes of conspiracy to distribute and possess with the intent to distribute narcotics, distribution and possession with the intent to distribute narcotics, and conspiracy to transport and/or receive stolen goods, as set forth in Schedule A to the application for the issuance of the search warrant, which is incorporated herein by reference.

                                              William T. Smith
                                              Special Agent
                                              Bureau of Alcohol, Tobacco, Firearms & Explosives

Sworn to and subscribed before me
this_____ day of June 2008, the District of Columbia

United States District Court Magistrate Judge

ATTACHMENT A

a. Books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, purchase, packaging, sale and distribution of controlled substances.

b. Address and telephone books, and papers reflecting names, addresses, and/or telephone numbers.

c. Books, records, receipts, bank statements, and records, money drafts, letters of credit, money orders and cashier checks, passbooks, bank checks and any other items evidencing the obtaining, secreting, transfer, and concealment of assets and expenditure of money.

d. Any and all electronic data processing and storage devices or other electronic equipment, such as computers, computer systems, keyboards, central processing units, external and/or internal drives, external and internal storage devices such as magnetic tapes and/or disks or diskettes, together with system documentation, operating logs and documentation, software and instruction manuals, passwords, test keys, and encryption codes or similar codes that are necessary to access computer programs, facsimile machines, telephone answering machines, telephone paging devices, caller identification, organizers, currency counting machines, and any other information stored in memory or contained in any related hardware and software.

e. Photographs, in particular, photographs of co-conspirators, assets, or controlled substances, and other documents identifying associates and co-conspirators.

f. Indicia of occupancy, residency, and ownership of the premises, including but not limited to, utility and telephone bills, correspondence, and keys.

g. Any locked or closed containers which could contain any of the above listed evidence.

h. Any evidence of participation in narcotics conspiracy.

i. Any evidence related to possession of weapons and/or firearms, including but not limited to revolvers, semi-automatic pistols, rifles, and ammunition.

j. United States currency, precious metals, jewelery and financial instruments, stocks and bonds.

k. Cellular telephones, pagers and records and receipts reflecting their ownership and use.

l. Safes, both combination and key type, and their contents.

m. Stolen property, including but not limited to gift cards, vacuum cleaners, kitchen mixers, and electronic equipment (including but not limited to flat screen televisions, mobile telephones, facsimile machines, telephone answering machines, telephone paging devices, currency counting machines, video game consoles, iPod music devices, and GPS units).